IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 20-1090
) Magistrate No. 20-9421
WILLIAM KAETZ )

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER DETENTION

AND NOW comes the United States of America, by its attorneys, Scott W. Brady, United States Attorney for the Western District of Pennsylvania, and Tonya Sulia Goodman, Assistant United States Attorney for said District, and submits the Government's Response in Opposition to Defendant's Motion to Reconsider Detention, and states in support thereof:

## I.    INTRODUCTION AND PROCEDURAL OVERVIEW

1.    On October 18, 2020, defendant William Kaetz was charged via a Criminal Complaint issued by United States Magistrate Judge Cathy L. Waldor, United States District Court for the District of New Jersey, with violations of Title 18, United States Code, Section 875(c) (Interstate Communications Containing Threats to Injure or Kill) and Title 18, United States Code, Section 115(a)(1)(B) (Threaten to Assault and Murder a United States Judge). A warrant was issued for his arrest. Deputies with the United States Marshals Service ("USMS") arrested the defendant pursuant to the warrant on the same day. On the following day, October 19, 2020, the defendant was presented for an initial appearance before Chief United States Magistrate Judge Cynthia R. Eddy, Western District of Pennsylvania. (*See* ECF No. 3[1].) The government moved for the defendant's pretrial detention. (ECF No. 11). The Court ordered the defendant's temporary detention and scheduled preliminary and detention hearings for October 22, 2020. (ECF No. 5.)

---

[1] All references to the docket herein are references to the docket at Magistrate Case No. 20-9421, as opposed to the newly opened Criminal Case No. 20-1090.

The defendant moved to continue the hearings, and they were rescheduled to October 26, 2020. (ECF Nos. 8, 9.)

2.      Chief Magistrate Judge Eddy presided over preliminary and detention hearings on October 26, 2020. At the conclusion of the hearings, Chief Magistrate Judge Eddy found probable cause that the defendant had committed the offenses charged in the Complaint and, further, that the defendant's continued detention pending trial was warranted. (*See* ECF Nos. 13, 15; *see also* Transcript of Preliminary Hearing/Detention Hearing, ECF No. 20, at 47, 62, 63.) Specifically, with respect to the question of detention, after considering the factors set forth at 18 U.S.C. § 3142(g), Chief Magistrate Judge Eddy found by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community. (ECF No. 15, at 2; ECF No. 20, at 63.) Chief Magistrate Judge Eddy found that the following factors support the defendant's detention: the weight of the evidence against the defendant is strong; the defendant's prior criminal history; the defendant's history of alcohol or substance abuse; and the defendant's prior violations of probation, parole, or supervised release. (ECF No. 15, at 2-3; *see also* ECF No. 20, at 61-63.)

3.      On December 16, 2020, the defendant filed a Motion to Reconsider Detention (ECF No. 22), asking the Court to overturn Chief Magistrate Judge Eddy's Order of Detention. The defendant asserts that the United States failed to demonstrate that the defendant poses a flight risk. (ECF No. 22, at 3.) He further asserts that he is not a danger to the community and submits that the Court could set conditions of release which can reasonably assure the safety of any one person or the community. (*Id*. at 4.)

## II.   THE OCTOBER 26, 2020 DETENTION HEARING

4.     At the detention hearing on October 26, 2020, the United States offered the

testimony of Paul Safier, Senior Inspector with the United States Marshals Service ("USMS") in

the District of New Jersey. (ECF No. 20, at 5.) In response to questions by the prosecutor and

defense counsel, Inspector Safier testified as follows.

5.     Inspector Safier began by testifying about his background and experience. (*Id*.)

He became involved in an investigation of William Kaetz as a result of actions that the defendant

had taken relating to three civil cases that he had pending before Judge 1. (*Id*. at 6.) The

defendant had historically actively filed documents related to those civil cases with the clerk's

office in New Jersey. (*Id*.) On September 24, 2020, however, the defendant sent a motion related

to one of the civil cases to the home of Judge 1. (*Id*. at 7-8.) The return address on the mailing

bore the defendant's home address. (*Id*. at 9.) It was unusual and very concerning for a litigant to

submit case-related papers to a judge's home address, and the USMS, therefore, immediately

responded to the home of Judge 1 to retrieve the papers to determine whether they contained

anything potentially harmful. (*Id*. at 8.) Because the defendant's mailing was so concerning, later

that day, deputies with the USMS responded to the defendant's home to interview him. (*Id*.)

When the USMS deputies arrived to interview the defendant, he appeared to be "elated" that he

had gotten the attention of the USMS. (*Id*. at 9.) The USMS advised the defendant that it was

inappropriate to send correspondence to Judge 1's home, and further, that all future

correspondence should be sent to the clerk's office at the courthouse. (*Id*. at 9-10.) The defendant

informed the USMS that he had paid an internet-based search service to obtain the home address

of Judge 1. (*Id*. at 10.)

6.      On September 30, 2020, the USMS learned that the defendant had also left a voicemail message on the phone line in Judge 1's chambers. (*Id*.) The defendant left the voicemail message on September 18, 2020 (i.e., prior to the time that he sent the mailing to Judge 1's home). (*Id*. 10.) The defendant identified himself in the voicemail message; said that he was unhappy with the pace of litigation; demanded that his case be reopened; demanded Judge 1's removal from the case and from the bench; said that he was not going to wait around for another bad decision; and said that he would not take no for an answer. (*Id*. at 11.) The phone number from which the call was placed is subscribed to the defendant. (*Id*. at 34.) An audio copy of the voicemail message was offered and admitted into evidence as government's Exhibit 1 and the recording was played during the hearing. (*Id*.)

7.      On October 18, 2020, at approximately 5:05 a.m., the defendant sent a threatening email communication to Judge 1, the USMS and others. (*Id*. at 12.) At the hearing, the government offered and admitted into evidence government's Exhibit 3, which was a copy of the email communication. (*Id*.) The email was sent to Judge 1's personal email account and to the U.S. Marshals' email account. (*Id*. at 13-14.) Inspector Safier read the email aloud in open court:

> Hello, U.S. Marshals. I filed this case a long time ago. It is to enforce Article IV, Section 4 of the U.S. Constitution. Judge 1 has been avoiding and stonewalling the case. It is of national importance. Judge 1 is a traitor and that has a death sentence. I would rather use the pen than the sword, but as this push for communism becomes all too real there will come a time to take down those people that fail to do their job to be loyal to this nation and that will be people like the traitor Judge 1. I have a motion for Judge 1's recusal, motions to reopen the case as per Judge 1's order, motions to expedite the case, and I will be filing a mandamus. I will try my best not to harm the traitor Judge 1 but, like I said, Judge 1 is a traitor and needs to be dealt with. You have an obligation to remove Judge 1. Read the court documents. The traitor Judge 1 lives at, correct address redacted. Stop by and ask Judge 1 why Judge 1 is stonewalling my case. Judge 1's home address will become public knowledge very soon, and God knows who has a grievance and what will happen after that. You want to protect the traitor Judge

> 1, enforce the Constitution. You come after me for writing this email will prove
> it's time to take up arms and civil war is inevitable. Remember your oath of office.
> This case must be opened and move forward now. This needs to be done now
> before the vote.

(*Id*. at 14-15.) Identifying information for the defendant, including his address of record and a

phone number subscribed in his name was contained within the email communication. (*Id*. at

15.) In addition to the USMS and Judge 1, the defendant had also sent the email to a justice

management division mailbox and to two other government employees at the Department of

Justice. (*Id*. at 37-38.) The email was gravely concerning to Inspector Safier and he took

immediate action. (*Id*. at 15.) Several elements of the email message were gravely concerning to

Inspector Safier, including: the talk about avoiding stonewalling the case, which had been a

recurrent theme; the urgency of it being of national importance; the reference to Judge 1 as a

traitor, with the penalty for such offense being a death sentence; the comment about using the

sword to take down those who fail to do their job; the defendant's comment that he would try to

do his best not to harm the traitor judge, but adding that the traitor judge had to be dealt with; the

indication that the defendant was going to dox the judge by publishing the judge's home address

(i.e., publicly disclosing the judge's personal information on the Internet with malicious intent);

the intent that others who may have a grievance will learn the judge's home address and act; and

the calls for insurrection and to take up arms. (*Id*. at 16.) In response to this email

communication, local police and the USMS were immediately dispatched to Judge 1's residence

and USMS deputies were also dispatched to conduct surveillance of the defendant. (*Id*. at 17.)

    8.    Also on October 18, 2020, sometime after the defendant sent the threatening email

communication, he made public posts to the social media sites Facebook and Twitter. (*Id*. at 18-

21.) Copies of the Twitter and Facebook posts were offered and admitted into evidence as government's Exhibit 2 at the hearing. Inspector Safier read the Twitter post aloud on the record:

> Kaetz versus the United States, et al., Fed Court New Jersey. It is to enforce Article IV, Section 4 of the U.S. Constitution. Judge 1 is stonewalling the case. Traitor Judge 1 lives at, address redacted. Let Judge 1 feel your anger for Judge 1's violation of Judge 1's oath of office.

(*Id*. at 19.) The Twitter post was posted on Bill Kaetz's Twitter account, which included a photo of the defendant at the top of the post. (*Id*.) Inspector Safier also read the Facebook post aloud on the record:

> I filed this case a long time ago, Kaetz v. United States, et al., Case 2:19-cv-08100-CCC, Fed Court District of New Jersey. It is to enforce Article IV, Section 4 of the U.S. Constitution. Republic form of government guarantee, Judge 1 has been avoiding and stonewalling the case. It is of national importance. The traitor Judge 1 lives at, address redacted. Please send Judge 1 a message on how you feel about Judge 1's failure to protect your rights and violate Judge 1's oath of office.

(*Id*. at 21.) The Facebook post was made in the name of defendant and posted to the North Jersey Regional Tea Party II public group. (*Id*. at 20.)

      9.    The defendant was charged via criminal complaint and a warrant was issued for his arrest. (*Id*. at 22.) When USMS deputies attempted to place the defendant under arrest, he was not compliant and had to be tased. (*Id*. at 23.) Upon arrival at the jail, the defendant stated that he had an idea of what the arrest was about and that he possibly had gotten drunk and sent some emails he probably shouldn't have sent. (*Id*. at 23.)

      10.    Inspector Safier also testified about the defendant's prior conviction in 2002 for mailing multiple threats to IRS officials in the Eastern District of Pennsylvania. (*Id*.) The defendant's threatening language in that case included threats to kill. (*Id*. at 24-25.) In that case,

6

the defendant was sentenced to three years of probation. (*Id*. at 23.) In 2006, the defendant violated his conditions of probation. (*Id*. at 24.)

11.     Inspector Safier also testified about the defendant's efforts to obtain a firearm, after he had been convicted of a felony in the 2002 case. (*Id*. at 25.) In 2019, the defendant applied for a firearms permit in his municipality. (*Id*.) The permit was denied by the Chief of Police on August 26, 2019. (*Id*.) In the firearm application, the defendant was not completely forthright about his prior felony conviction. (*Id*.)

12.     Inspector Safier also testified about other incidents concerning the defendant's threatening behavior. (*Id*. at 26.) In the course of civil litigation with the IRS, the defendant sent to the Court in the Middle District of Pennsylvania correspondence which was deemed threatening, and deputy U.S. Marshals interviewed him at that time. (*Id*.) In the course of one of the cases pending before Judge 1, the defendant made efforts to personally serve former United States President Barack Obama and he traveled to Chappaqua to enlist the services of the local sheriff there to attempt to serve former Secretary of State Hillary Clinton. (*Id*.) The defendant also attempted to subpoena Judge 1 in connection with one of the cases that was pending before Judge 1. (*Id*.)

13.     Inspector Safier also provided testimony about the defendant's daughter. (*Id*. at 28.) He testified that the defendant's daughter lives with the defendant and was a co-plaintiff with the defendant in one of the cases that was pending before Judge 1. (*Id*.) He further testified that the defendant's daughter has an active PFA against her. (*Id*.)

14.     Inspector Safier also testified about a search warrant which had been executed at the defendant's residence earlier that same morning. (*Id*. at 29.) During the execution of the

7

search warrant, FBI agents recovered from a search of the defendant's daughter's room cannabis, marijuana edibles, and paraphernalia. (*Id*.) She did not have a permit or card which authorized her possession of those items. (*Id*.) Elsewhere in the defendant's house, agents recover a bolt-action rifle and ammunition. (*Id*.)

15.     Following Inspector Safier's testimony, the government proffered the Criminal Complaint. (*Id*.)

16.     The Court then provided the government and the defendant with an opportunity to make legal arguments as to the probable cause finding. (*Id*. at 46-47.) Following the arguments by counsel, Chief Magistrate Judge Eddy found that the government had established probable cause that the defendant committed the offenses charged in the Criminal Complaint. (*Id*. at 47.)

17.     The Court then went on to consider the detention portion of the hearing. (*Id*. at 48.) The defendant asked the Court to incorporate the report prepared by the New Jersey Probation Office. (*Id*.) The defendant then called his daughter, Catherine Kaetz, as a witness, and offered her as a third-party custodian. (*Id*.)

18.     Catherine Kaetz, who is 28 years old, testified on behalf of the defendant. (*Id*. at 49.) In response to questions from defense counsel and the prosecutor, Catherine Kaetz testified as follows. She resides with her father and her aunt, the defendant's sister. (*Id*.) She is unemployed due to COVID-19 and is looking for a winter job. (*Id*. at 50.) Her father is self-employed, and she performs per diem work for him as his assistant. (*Id*.) Catherine Kaetz then testified about the circumstances surrounding her arrest related to a temporary PFA, which was the subject of one of the defendant's civil cases pending before Judge 1. (*Id*. at 51-52.) Catherine Kaetz testified that if she were to serve as a third-party custodian for her father, she would

inform probation, the Court, and the Marshals if her father was in violation of Judge Eddy's conditions of release. (*Id*. at 52-53.) However, in response to questions by the government, Ms. Kaetz acknowledged that she is "out of the house a lot," that she is a "a very active person," and that she really enjoys visiting her mother, who lives roughly two hours away from the defendant. (*Id*. at 53-54.) Ms. Kaetz confirmed that the three-year PFA (which was the subject of one of the cases pending before Judge 1) is presently active and resulted from a "heated argument" between Ms. Kaetz and her ex-boyfriend. (*Id*. at 54.) Ms. Kaetz acknowledged that she is aware that Judge 1 was presiding over the civil lawsuit relating to the PFA and that she felt "a little frustrated that Judge 1 seemed to just put it to the side and haven't [sic] answered and taken action" and that she believes that Judge 1 did not comply with proper procedures. (*Id*. at 55-56.)

19.     Chief Magistrate Judge Eddy then provided the parties with an opportunity to make legal arguments related to the issue of detention. (*Id*. at 56-61.)

20.     Following the arguments of the parties, and after considering the evidence/witnesses put forth at the hearing, the Complaint, and the Pretrial Services report, the Court found by clear and convincing evidence that no conditions will reasonably ensure the safety of the community and ordered the defendant's detention pending trial. (*Id*. at 63.)

21.     For the reasons set forth below, this Court should not overturn Chief Magistrate Judge Eddy's Order of Detention, and the Court should deny the defendant's Motion to Reconsider Detention.

### III.     <u>LEGAL ANALYSIS</u>

### A.     <u>Standard of Review</u>

22.     This Court exercises de novo review over the Order of Detention issued by Chief

Magistrate Judge Eddy. *See United States v. Delker*, 757 F.2d 1390, 1393-95 (3d Cir. 1985). Where, as is here, a transcript of the detention hearing is available, the district court should give careful consideration to the magistrate's decision and reasoning. *Id*. at 1395. "Clearly, the district court is not required to start over in every case, and proceed as if the magistrate's decision and findings did not exist." *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The Court may incorporate the records of the detention hearing conducted on October 26, 2020 and is not required to conduct any additional evidentiary hearing. *See United States v. Nelson*, No. 2:08-cr-365, 2008 WL 5287095, at *2 (W.D. Pa. Dec. 19, 2008).

## B.     The Bail Reform Act of 1984

23.     Title 18, United States Code, Section 3142(f)(1)(A) provides, in pertinent part,

Detention hearing.--The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community—

(1) upon motion of the attorney for the Government, in a case that involves—

(A) a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed.

"Crime of violence" is defined as:

(A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another;

(B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense; or

(C) any felony under chapter 77, 109A, 110, or 117.

18  U.S.C. § 3156(a)(4).

10

24.     It is firmly established that, with respect to community danger, evidence pertaining solely to "character and lifestyle" or community ties is insufficient to meet this burden. *Delker*, 757 F.2d at 1396 (legislative history of the Bail Reform Act shows that "presence of [a tie to the community] . . . has no correlation with the question of safety of the community."); *see also United States v. Strong*, 775 F.2d 504, 508 (3d Cir. 1985). Danger to the community, even without a risk of flight, is sufficient for pretrial detention. *United States v. Perry*, 788 F.2d 106, 113 (3d Cir. 1986). The United States must establish risk of flight by a preponderance of the evidence and danger to the community by clear and convincing evidence. *Id.* at 115.

25.     In determining whether a defendant poses a risk of flight and/or a danger to the community, the following factors are to be considered:

(1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ;

(2)     the weight of the evidence against the person;

(3)     the history and characteristics of the person, including-

(A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and,

(B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or other release pending trial, . . . ; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also Delker*, 757 F.2d at 1398-99.

11

## IV.  **ARGUMENT**

26.     In this case, there are no conditions or combination of conditions which will reasonably assure the safety of the community. This Court, therefore, should not disturb Chief Magistrate Judge Eddy's Order of Detention.

27.     The Bail Reform Act requires the Court to consider the following:

> **(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device. 18 U.S.C. § 3142(g)(1)**

28.     Here, the defendant has been charged by complaint with committing two serious crimes of violence – one count of Interstate Communications Containing Threats to Injure or Kill, in violation of Title 18, United States Code, Section 875(c); and one count of Threaten to Assault and Murder a United States Judge, in violation of Title 18, United States Code, Section 115(a)(1)(B). At the hearing on October 26, 2020, Chief Magistrate Judge Eddy found probable cause that the defendant committed these offenses. (ECF No. 13.) Moreover, the Defendant concedes that these offenses are "crime[s] of violence" pursuant to 18 U.S.C. § 3156. (ECF No. 22, at 6.) g

29.     The defendant argues in his Motion that he is not a danger to the community. (ECF No. 22, at 4.) However, the words used by the defendant in the threatening email communication *alone* demonstrate that the defendant is a danger, especially to Judge 1, and to the community at large. The words provide evidence, first, that the defendant intends to use violence, including causing the death of Judge 1, if his demands are not met: "Judge 1 is a traitor and that has ***a death sentence*** . . . I will try my best not to harm the traitor Judge 1 but, like I said, Judge 1 is a traitor and ***needs to be dealt with*** . . . Judge 1's home address will become public knowledge very soon,

and ***God knows who has a grievance and what will happen after that*** . . . (*See* ECF No. 20, at 14-15) (emphasis added.) These words very clearly demonstrate that the defendant poses a real danger to Judge 1. Moreover, the defendant's words very clearly demonstrate that he likewise poses a real danger to others in the community: "You want to protect the traitor Judge 1, enforce the Constitution. You come after me for writing this email will prove ***it's time to take up arms*** and ***civil war is inevitable***." (*See id*.) (emphasis added.)

30.     The threats emailed by the defendant in this case are very similar to threats emailed by the defendant in *United States v. Kabbaj*, Criminal No. 16-365, 2016 WL 11660082, at *4-5 (E.D. Pa. Sept. 12, 2016). In K*abbaj*, the defendant was charged with the exact same offenses as defendant Kaetz is here. *Id*. at 11. The District Court in *Kabbaj* denied the defendant's motion for pretrial release. *Id*. at 14. Analyzing the nature and circumstances of the offenses charged, the Court in *Kabbaj* recognized both the particular danger to the victim of the threat and the general danger to the community at large:

> The nature and circumstances of the offenses allegedly committed by Mr. Kabbaj are dangerous to the individuals to whom they are addressed and the community at large. The nature of the offenses is violent. Mr. Kabbaj's statements describe actions either he wishes to take or will incite others, directly and indirectly, to complete.

*Id*. at 12. In the case at hand, defendant Kaetz likewise describes violent actions he wishes to take along with violent actions he incites others to complete.

31.     The defendant asserts that 59 pages of attachments which were included with the threatening email sent on October 18, 2020, but not offered into evidence at the detention hearing, somehow alter the violent nature and intent of the email communication. (ECF No. 22, at 6.) The attachments to the email were similar to the materials mailed to Judge 1 at her home – essentially

a motion seeking Judge 1's recusal from his case and removal from the bench. (*Id*. at 7.) As an initial matter, the defendant's argument fails on legal grounds because "[a]ctivities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message." *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir. 2000). So, any message that the defendant intended to communicate via the attachments to the threatening email is wholly irrelevant. The fact that the defendant attached to the threatening email copies of his motion for recusal/removal does nothing to change the nature and intent of the words used by the defendant in the email itself.

32.     In fact, to the contrary, the attachments to the email actually further support the conclusion that the defendant poses a danger to the community. The attachment of those materials to the email demonstrates the escalating dangerousness of the defendant's behavior. He initially filed those materials on the court's docket, but failed to get his desired result. *See Kaetz v. United States, et al*., 2:19-cv-08100-KM-JBC, Motion for Recusal by William F. Kaetz, ECF No. 33 (DNJ, Aug. 7, 2020). He then left a message at Judge 1's chambers, demanding the same actions and again failed to get his desired result. He then mailed the same materials to Judge 1's home, but once again failed to get the desired result. Finally, he attached the same materials to an email in which he threated to kill Judge 1 if he did not finally get the desired result. The attachment of the 59 pages of materials to the October 18, 2020 email, therefore, demonstrates the escalating dangerousness of the defendant's conduct and the ever-increasing lengths to which he was willing to go in order to achieve his desired result.

33.     The defendant next argues that he does not pose a danger to the community because he sent the threatening email communication after he had consumed too much alcohol. (ECF No.

22, at 8.) Aside from the defendant's self-serving statement at arrest, however, there was no evidence adduced at the detention hearing that the defendant was intoxicated at the time that he sent the threatening email communication. In fact, with respect to the nature and circumstances of the offense, Chief Magistrate Judge Eddy found no evidence that the defendant was intoxicated when he sent the email, stating,

> Even though Mr. Sughrue characterizes it as a late night, drunk email sending or whatever, there wasn't just one threat involved in this case but there are multiple communications. There's no evidence that the defendant was drunk at the time.

(ECF No. 20, at 61-62.)

34.     Further evidence that the defendant was not intoxicated at the time that he sent the threatening email communication is supported by his own statements in recorded telephone calls made from jail. The government subpoenaed the defendant's recorded telephone calls from the Essex County Jail, where he is currently detained. For example, in a call with his fiancé, Georgia Christatos, on November 1, 2020, at 4:43 p.m., the defendant explained his state of mind at the time that he sent the threatening email communication:

> You know, I expressed my feelings, and I asked them to, you know, to investigate her.   To ask her, you know, why she's doing this to me.   You know?   And they turn around like I'm, I'm a crazy lunatic.  Ok?   (UI) Yeah, it's kind of ortho, you know, it wasn't right to do, it was unorthodox.   I should've used the legal system to do this stuff.   I know.   **I just, you know, it was like five in the morning, I couldn't sleep, I was upset, I was thinkin' about it, and I just did it.   Ok? Alright?   It was stupid, I'm an idiot.   I, what can I say?**   You know, but I'm not some lunatic, crazy dude.   Ok?   Alright? And they're making me out to be some lunatic, cause I'm not.

A full transcript of the recorded call is attached hereto as Exhibit 1. Notably, in the call, the defendant makes no mention of being intoxicated at the time that he sent the email. Instead, in this call, the defendant asserts that he sent the email because he was ***upset*** with Judge 1's actions.

As there is no evidence, other than his self-serving statement at arrest, that the defendant was intoxicated at the time that he sent the threatening email, the Court should not consider his alleged intoxication as a factor in favor of his release from custody.

35.     The nature and circumstances of these offenses weigh very heavily in favor of the defendant's continued detention.

**(2)  The weight of the evidence against the person. 18 U.S.C. § 3142(g)(2)**

36.     To prove a violation of 18 U.S.C. § 115(a)(1)(B), the government must demonstrate: (1) the defendant threatened to assault or murder; (2) a federal judge; (3) with the intent to impede, intimidate, interfere with, or retaliate against that judge, on account of the judge's performance of official duties. *See United States v. D'Amario*, 330 F. App'x 409, 412 (3d Cir. 2009).

37.     To prove a violation of 18 U.S.C. § 875(c), the government must demonstrate that the defendant willfully and knowingly transmitted a threat in interstate commerce. *United States v. Elonis*, 135 S. Ct. 2001, 2008 (2015). Section 875(c) contains both a subjective and objective component, and the Government must satisfy both in order to convict a defendant under the statute." *United States v. Elonis (Elonis III)*, 841 F.3d 589, 596 (3d Cir. 2016). To satisfy the objective component, the Government must "prove beyond a reasonable doubt that the defendant transmitted a communication that a reasonable person would view as a threat." *Id*. This "requires the [factfinder] to consider the context and circumstances in which a communication was made to determine whether a reasonable person would consider the communication to be a serious expression of an intent to inflict bodily injury on an individual." *Id.* at 597. To satisfy the subjective component of § 875(c), the Government must demonstrate beyond a reasonable doubt

16

that the defendant transmitted a communication for the purpose of issuing a threat or with knowledge that the communication would be viewed as a threat." *Id*. at 596. In *Elonis II*, the court found the requirement of subjective intent was satisfied when, *inter alia*, the defendant's statements were so graphic and specific that no reasonable jury could find the defendant acted for a purpose other than to issue a threat. *See id.* at 600.

38.     Probable cause for these offenses was found first by Magistrate Judge Waldor when she issued the Criminal Complaint charging defendant Kaetz. Chief Magistrate Judge Eddy also found probable cause for these offenses following the preliminary hearing on October 26, 2020. (*See* ECF No. 13, ECF No. 20, at 47.) With respect to the weight of the evidence against the defendant, Chief Magistrate Judge Eddy stated,

> I've just found that there is probable cause to believe that the defendant committed the offense by virtue of my finding after hearing the evidence in the probable cause hearing.

(ECF No. 20, at 62.)

39.     Here, the weight of the evidence against the defendant is incredibly strong. The evidence is overwhelming that defendant William Kaetz sent the email communication. Even the defendant himself does not contest that he sent the email. *See, e.g.,* Exhibit 1. There is no question that the email was sent to a federal judge who was presiding over the defendant's civil cases. Again, the defendant himself does not contest that. *See*, *e.g.*, Exhibit 1. And, the email very clearly contained a threat to murder – "Judge 1 is a traitor and that has ***a death sentence***."

40.     The only question, therefore, is whether the government can prove beyond a reasonable doubt that a reasonable person would view the email communication as a threat and that the defendant transmitted the communication for the purpose of issuing a threat or with

knowledge that the communication would be viewed as a threat. The government's evidence demonstrates clearly that people objectively considered the threats communicated by the defendant to be a serious expression of his intent to inflict bodily injury on Judge 1. In response to the email, local police and the USMS immediately responded to Judge 1's home and began surveillance of the defendant. (*See* ECF No. 20, at 17.) The defendant's subjective intent is also clearly supported by the evidence in the case, given that the statements were so graphic and specific that no reasonable jury could find the defendant acted for a purpose other than to issue a threat. The context in which the email communication was sent provides further evidence of the defendant's specific intent – i.e., he sent the threatening email communication only after several other attempts to get the result that he achieved (Judge 1's recusal/removal) failed.

41.     The weight of the evidence against the defendant tilts very heavily in favor of the defendant's continued detention in this case.

> **(3) The history and characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law. 18 U.S.C. §§ 3142(g)(3)(A) and 3142(g)(3)(B)**

42.     Most significant to the analysis of the history and characteristics of the defendant is the fact of his prior conviction for the same type of offense. On December 16, 2002, the defendant waived his right to indictment and pleaded guilty to a one-count Information, charging him with mailing threatening communications, in violation of 18 U.S.C. § 876. *See United States v. Kaetz*, Criminal No. 2:02-cr-00752-RBS-1, ECF No. 17 (E.D. Pa. 2002). A copy

18

of the Information is attached as Exhibit 2 hereto. In that case, the defendant threatened to use deadly force against an IRS Agent if she did not release a federal tax lien which had been filed against him. *See* Exhibit 2. Eerily similar to his actions in the case at hand, the defendant had researched the home of address the IRS Agent in that case and warned her that he knew where she lived. *Id.*

43.     In that case, the defendant was sentenced to three years of probation. *See United States v. Kaetz*, Criminal No. 2:02-cr-00752-RBS-1, Judgement, ECF No. 25 (E.D. Pa. 2003). The defendant asserts in his Motion that the Pretrial Services report did not mention that the defendant was found to be in violation of his probation in the 2003 case. (ECF No. 22, at 27.) However, the docket in that case makes clear that the defendant did violate his conditions of probation and the violations were proven at a hearing before the District Court judge:

> Minute Entry for proceedings held before Judge R. BARCLAY SURRICK. Final Probation Revocation Hearing as to WILLIAM F. KAETZ held on 3/20/2006. Probation Officer, William McCarthy, Sworn. Witnesses called and Sworn. Defendant declines to address the Court. Statements by counsel. Court findings: Defendant has violated certain conditions of probation, probation is revoked, while in custody at the FDC the defendant will undergo psychiagtric [sic] and psychological testing, after the results of those test are reviewed by the Court a final VOP will be scheduled. Defendant Fires Attorney. Defense counsel ask to withdraw as counsel. Court denies counsel's request. Court Reporter A. Mack, Esr.(dt) (Entered: 03/20/2006)

*United States v. Kaetz*, Criminal No. 2:02-cr-00752-RBS-1, ECF No. 51 (E.D. Pa. 2006). The defendant's re-arrest now on nearly identical charges demonstrates that the defendant was not deterred by his prior criminal conviction and evidences the defendant's lack of remorse for his conduct.

44.     By virtue of his 2003 felony conviction, the defendant was prohibited from possessing a firearm. Nevertheless, roughly one year prior to the time that his threatening attacks

19

on Judge 1 began, the defendant attempted to purchase a firearm. (*See* ECF No. 20, at 25.) Fortunately, the local police department denied the defendant's request. (*Id*.) Perhaps in anticipation of acquiring a firearm by some other means, the defendant was in possession of very large caliber ammunition when FBI agents executed a search warrant at his home on October 26, 2020. Attached hereto as Exhibit 3 is a photograph of the ammunition recovered from the defendant's home on October 26, 2020. That the defendant tried to acquire a firearm and had successfully acquired ammunition provides clear evidence that he did intend to carry out the violent threats against Judge 1.

45.     The defendant attributes his conduct, in part, to stress induced by the COVID-19 pandemic. (*See* ECF No. 22, at 24-26.) He asserts that he "was not built to endure a pandemic." (*Id*. at 22.) This argument, however, does not weigh in favor of his release. Conditions caused by the COVID-19 pandemic have not subsided since the defendant's arrest; in fact, they have worsened. The government fails to see, therefore, how the defendant will fare any better under the present conditions of the pandemic.

46.     To demonstrate his good character, the defendant attached four letters to his Motion. (ECF No. 22-1.) The government queries, however, whether his character witnesses are aware of the true nature of the offenses with which the defendant has been charged. In a recorded jail call on November 14, 2020, at 2:28 p.m., the defendant asked his fiancé, Ms. Christatos, to assist him with recruiting others to write character letters on his behalf. In the recorded communication, the defendant provided to Ms. Christatos his characterization of the nature of the charges against him, and he coached her as to what explanation she should provide to his character witnesses to induce them to write letters on his behalf:

20

WK: And um, I need letters of, of character from you, from anybody else, Gary, and uh, Claudia would be nice, and Catherine is going to get one. She asked um, she's going to ask Trey, from California, to (UI) a nice letter. Um, you know, a few letters of recommendation, that, you know, I'm not a threat to society, ok?

GC: Hmm hmm.

WK: Umm, I was frustrated with the judge, and that's why he wrote the letter. And, that's it.

WK: I have the court papers here, ok? And I only see two counts, ok? Alright? (UI) crap. **And they just took my words and they twisted around to create these charges, ok? I didn't mean that, and I didn't say that, ok? I used strong words, but clearly, I petitioned the government to do something for me.   It's First Amendment rights.**

47.     The government questions, therefore, whether the defendant's character witnesses know the true nature and circumstances of the charges pending against him.

48.     With respect to defendant's history and characteristics, Chief Magistrate Judge Eddy reasoned,

> I've considered his prior criminal history. It's most concerning that this is the second time Mr. Kaetz has been accused of making threatening communications to federal officials, having been found guilty or having pled guilty to that charge in 2002 and sentenced to three years probation. At that particular case he was found to be in violation of his probation and ordered to undergo certain testing. I also find it concerning that the defendant was applying for a firearms license in 2019. I'm not sure what those particular circumstances are, and certainly during the search conducted today wherein a Bolt shotgun and ammunition was found.

(ECF No. 20, at 62-63.)

49.     As Chief Magistrate Judge Eddy concluded, the defendant's history and characteristics weigh in favor of his continued detention here. He has a prior conviction for the same type of threatening behavior and was clearly undeterred by his prior federal felony conviction. The dangerous nature of his conduct is heightened by the fact that he had attempted to purchase a firearm and had obtained ammunition. And, with the COVID-19 pandemic surging,

21

there is no reason to believe that if released the defendant will be able to any better cope with stressful life circumstances associated with the pandemic.

**(4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(4)**

50.     An analysis of this prong of the statute weighs heavily in favor of the defendant's detention in this case. The defendant threatened to kill Judge 1, publicly disseminated her home address, and incited others to "let her feel your anger." (ECF No. 20, at 19.) It is hard to imagine a situation which would pose a more serious danger to Judge 1 than the defendant's release in this case. His public calls to action and his incitement of others to engage in violence, likewise, evidence a similar serious danger posed to the community in general. There is no way that the Court would be able to impose conditions which would be sufficient to assure the safety of Judge 1 or the community. As the Court in *Kabbaj* explained,

> Given Mr. Kabbaj feels compelled to issue such statements for the sake of him and others, there is no reason to believe he will not continue to do so if released. His words are too serious and dangerous to risk allowing the issuance of such statements to continue. His words are intended to incite others to act. Thus, even if to motivate others, including the "female hackers" to avenge him by harming Judge Thynge.

20161 WL 1660082, at *14.

## V.    DEFENDANT'S PROPOSED THIRD-PARTY CUSTODIAN

51.     As he did at the detention hearing, in his Motion, the defendant again renews his suggestion that his daughter, Catherine Kaetz, could serve as a third-party custodian for him. (ECF No. 22, at 24.) Chief Magistrate Judge Eddy, having had an opportunity to personally observe Ms. Kaetz's demeanor and credibility, unequivocally found that she would not be a suitable third-party custodian, stating,

22

> I find that Mr. Kaetz's daughter offered as a custodian is unsuitable, particularly as she is a litigant before Judge 1. It's not clear when she's in the house, and it's not clear to me she would have any control over her father. If he were to violate conditions, a report to the probation office could be untimely. That is not clear.

(ECF No. 20, at 63.)

52.    The government concurs with Chief Magistrate Judge Eddy's findings. The defendant was living with his daughter at the time that he committed these offenses. (ECF No. 20, at 49.) There is no reason to believe, therefore, that releasing the defendant to her custody would in any way reduce the danger that he poses to the community. Moreover, given that Ms. Kaetz herself was a plaintiff in one of the cases pending before Judge 1, her personal connection to the facts in the case at hand is a little to close for comfort. Ms. Kaetz expressed that she too felt "a little frustrated that Judge 1 seemed to just put it to the side and haven't [sic] answered and taken action" and that she believed that Judge 1 had not complied with proper procedure. (*Id.* at 55-56.) Ms. Kaetz's negative thoughts and opinion of Judge 1 could influence and incite the defendant to engage in dangerous conduct if he were released into her custody. Additionally, during the search of the defendant's home, agents recovered cannabis, marijuana edibles, and paraphernalia from Ms. Kaetz's room. (ECF No. 20, at 29.)

53.    In consideration of the foregoing, the government submits that appointing Ms. Kaetz as a third-party custodian for the defendant will not be sufficient to assure the safety of the community.

### VI.    CONCLUSION

54.    The above demonstrates by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of other persons and the community. This Court, therefore, should not disturb Chief Magistrate Judge Eddy's Order of Detention. The

government respectfully requests that this Court deny the defendant's Motion to Reconsider Detention (ECF No. 22), and order that defendant William Kaetz remain detained pending trial.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney


s/Tonya Sulia Goodman
TONYA SULIA GOODMAN
Assistant U.S. Attorney
U.S. Attorney's Office
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
Tonya.Goodman@usdoj.gov
PA ID No. 204724

24